UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

MARIA E. LICEA, )
)
                         Plaintiff, )
)
          vs. )
) No. 1:12-cv-01588-LJM-DML
CAROLYN W. COLVIN )
Acting Commissioner of Social Security,[1] )
)
                         Defendant. )

## ENTRY ON JUDICIAL REVIEW

Plaintiff Marie E. Licea ("Licea") requests judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security (the "Commissioner"), which denied Licea's applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") benefits under titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416, 423 & 1382c.  Licea asserts that substantial evidence fails to support the Commissioner's decision that Licea was not disabled prior to her birthdate in 2010, because the Administrative Law Judge ("ALJ") improperly applied the Medical-Vocational Guidelines ("Grid") rather than build a logical bridge from the medical evidence to his conclusion; that the ALJ failed, as required, to articulate whether or not Licea's medical impairments medically equaled a listed impairment; and that the ALJ's credibility determination was clearly erroneous.  Licea seeks reversal of the Commissioner's decision and a remand for an award of benefits; or reversal for a new hearing.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court has substituted Carolyn W. Colvin for Michael J. Astrue as the named Defendant.

I.    **BACKGROUND**[2]

A.    **PROCEDURAL HISTORY**

Licea filed her applications for SSI and DIB on February 9, 2009 alleging that she became disabled on February 24, 2006, because of symptoms associated with radial nerve palsy, fibromyalgia, epicondylitis syndrome, and an impingement in the shoulder. R. at 111-114, 115-119, 140.   Her applications were denied initially and upon reconsideration.  *Id.* at 44-47.

On March 25, 2011, Licea appeared with her attorney and testified at a hearing before an ALJ.  *Id.* at 31-43.

On May 6, 2011, the ALJ issued a decision in which he concluded that Licea was disabled under the Social Security Act ("SSA"), pursuant the Grid, as of the date of her forty-fifth birthday, but was not disabled prior to that date because she was able to perform work that existed in significant number in the national economy.  *Id.* at 16-24.

On September 5, 2012, the Appeals Council denied Licea's request for review of the ALJ's decision.  *Id.* at 1-6.  At that point, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

On October 29, 2012, Licea timely filed her appeal by filing a Complaint in this Court.  Dkt. No. 1.  She filed her brief in support of her Complaint on May 29, 2013. Dkt. No. 19.

---

[2] The factual scenario in this case is largely undisputed; therefore, much of the Background section is duplicative of the parties' briefs and the ALJ's decision.

**B.  AGE, EDUCATION, WORK HISTORY &
LICEA'S PERCEPTION OF HER IMPAIRMENTS**

Licea was forty years old at the time of her alleged onset date.  **cite**.   She turned forty-five years old in 2010.  Tr. at 111.  At all relevant times, Licea had a high school education but could not speak or understand English.  *Id.* at 139.  Prior to the alleged onset date of her disability, Licea had worked as a housekeeper in a department store.  *Id.* at 35, 141.  In that job she had to lift up to 100 pounds.  *Id.* at 35.

At the hearing, Licea testified that she was right handed.  *Id.* at 34.  She complained of pain in her arms, neck, back and down her legs to her heels, particularly her left leg.  *Id.* at 35.  The pain was more severe in her left arm, but Licea stated that she also experienced pain in her right arm doing simple activities such as combing her hair or writing; she also tended to drop things.  *Id.* at 36, 38.  Licea testified that she could lift five pounds, but it also caused her pain.  *Id.* at 38.  She also experienced pain when kneeling, bending and going up and down stairs.  *Id.*  Licea claimed that she had problems driving because of pain in her arms when she turned the steering wheel.  *Id.* at 35.  Pain medications helped; however, they hurt her stomach and caused inflammation of her liver.  *Id.* at 36-37.

Licea testified that she could stand for one minute and that her walking was limited to one block.  *Id.* at 37.  She sometimes fell when walking and had to stop and take rest breaks every few minutes.  *Id.* at 38-39.  However, she could only sit for fifteen minutes at a time.  *Id.* at 37.  Licea stated that she needed help doing laundry, going to the grocery store, dressing and bathing.  *Id.* at 40.

Licea's daughter, Virgen Tamayo ("Virgen"), testified that she helped her mother comb and blow dry her hair.  *Id.* at 42.  Virgen also helped Licea scrub her back, reach

objects stored up high, take items off the grocery store shelves and do laundry.   *Id.*
Virgen also stated that Licea was unable to hold Virgen's baby.   *Id.*   Virgen testified that
she had been helping Licea with these activities and noticed these limitations in 2007.

### C.  RELEVANT MEDICAL EVIDENCE

#### 1.  <u>Treatment Records</u>

On March 29, 2006, Licea was evaluated by Dr. Ralph Buschbacher, M.D. ("Dr.
Buschbacher").   R. at 246.   Dr. Buschbaher noted that on February 23, 2006, Licea was
using machine that recycled boxes at work that required repetitive puling and loading-
type activities.   *Id.* at 245.   She was removing compressed boxes weighing 400 pounds
when she began to develop pain mainly in the left arm in the ulnar distribution with
burning and tingling.   *Id.* at 245 & 302.   She sought treatment the next day.   *Id.* at 245.
Licea was also complaining of symptoms in the left shoulder, left lateral epicondylar
area, and on the right lateral epicondylar area, as well as a generalized aching
throughout both upper extremities.   *Id.*   She had received physical therapy, but it had
not given her any lasting relief.   *Id.*   Ibuprofen and ice relieved her symptoms.   *Id.*   Any
kind of activity aggravated them.   *Id.*

Upon examination, Dr. Buschbacher reported that Licea had pain in her elbows,
arms and shoulders.   He concluded that she had overuse problems with both arms and
that her work restrictions should continue.   *Id.* at 245-46.   He ordered and EMG and x-
rays of Licea's right shoulder and elbow and left elbow.   *Id.* at 246.

On April 17, 2006, Licea had a follow-up appointment with Dr. Buschbacher.   *Id.*
at 243.   At that time, Dr. Buschbacher reported that Licea was having bilateral elbow
and forearm pain, which was confirmed upon examination.   *Id.*   He also reported that

4

the EMG showed no evidence of ulnar neuropathy and her x-rays were unremarkable. *Id.* He ordered occupational therapy. *Id.*

Licea saw Dr. Buschbacher for treatment again on April 27, 2006. *Id.* at 240. Licea reported continued bilateral arm symptoms and a slight amount of pain in the left shoulder. *Id.* Dr. Buschbacher concluded that Licea had "a quite well-developed case of bilateral arm overuse syndrome," which "is very difficult to treat." *Id.* He gave her injections in both the left and right lateral epicondylar areas. *Id.* Dr. Buschbacher opined that she could office or sedentary work, but he was not sure Licea was qualified to do it, but in any case, "[s]he certainly [could not] do any kind of housekeeping activities at this time." *Id.*

On June 8, 2006, Licea was referred for a physiatric evaluation of both arms. *Id.* at 302. Dr. David Steinberg, DO ("Dr. Steinberg"), noted that Licea was not working because her employer could not accommodate her restrictions. *Id.* He also reported that Licea "appeared to be in no pain." *Id.* at 303. There was no tenderness to palpation of the major bony landmarks and soft tissue structures of the spine and she had a full range of motion without pain. *Id.* Licea showed normal strength in all upper extremity muscle groups bilaterally. *Id.* With respect to her arms, Dr. Steinberg reported that Licea had point tenderness at the bilateral medial and lateral epicondyles, but no swelling, erythema or warmth. *Id.* Tinel's test over the cubital tunnel, pornator compression test and radial tunnel compression test were all negative bilaterally. *Id.*

As to Licea's hands, Dr. Steinberg performed Tinel's test and Phalen's test, which were both negative bilaterally. *Id.* at 303-04.

Dr. Steinberg made the following assessment:  "Epicondylitis Lat., 726.32," and "Epicondylitis Med., 726.31."  *Id.* at 304.  He advised Licea to begin physical therapy. *Id.*

Licea was evaluated for physical therapy on June 13, 2006.  *Id.* at 345.  She reported that her pain with activity was seven or eight out of ten.  *Id.*  The pain radiated bilaterally through the elbow, upper arm and shoulders.  *Id.*  Licea also reported tht she could perform adult daily living tasks, but had difficulty with them because of pain.  *Id.* Licea required rest to perform housekeeping tasks and had pain when doing laundry or lifting objects.  *Id.*  She also reported decreased ability to grip objects because of pain. *Id.*  The therapist noted the following problems that would warrant therapy:  "decreased work ability, soft tissue pain, tenderness with palpation, decreased strength, decreased ADL function."  *Id.*  The physical therapist started Licea on a home exercise program and recommended three to four sessions a week with a therapist.  *Id.* at 346.

On June 20, 2006, Licea had a physical therapy session at which she reported increased pain from working five hours the previous day.  *Id.* at 341.  At her physical therapy session on June 26, 2006, Licea reported increased pain with activity and new onset of pain into both thumbs and tingling pain into the left ring and small fingers.  *Id.* at 339.  The next day, Licea reported pain in both shoulders as well.  *Id.* at 338.

On June 29, 2006, Licea had a follow up appointment with Dr. Steinberg.  *Id.* at 300.  Licea reported that her symptoms were unchanged since her last visit and that she had been going to physical therapy three times per week.  *Id.*  Licea reported using the Lidoderm patches Dr. Steinberg has prescribed for only three days because she did not think they were helping her.  *Id.*  Dr. Steinberg noted that this would not be an

adequate trial.  *Id.*  Dr. Steinberg fitted Licea with braces for her elbows and she was instructed to wear them at all times except when bathing or sleeping.  *Id.*  He advised Licea to use the prescribed medicine.  *Id.* at 301.

Licea continued with physical therapy, which now included both shoulder and elbow treatment; but continued to need assistance with adult daily living tasks and continued to report pain.  *Id.* at 331, 312.

On August 1, 2006, Licea met with Dr. Steinberg for another follow up.  *Id.* at 298.  She reported pain at a nine out of ten level at rest; and ten out of ten with activity.  *Id.*  She claimed the prescribe medicine did not help her pain and she did not find physical therapy helpful.  *Id.*  Upon examination, Dr. Steinberg reported "diffuse tenderness both medially and laterally on the elbow . . . [but] more exquisitely tender along the right lateral epicondyle and medial epicondyle."  *Id.*  Dr. Steinberg advised Licea to discontinue physical therapy, but continue with a self-directed home exercise program and discontinue the medication.  *Id.*  Dr. Steinberg recommended a physiatry consult visit with another physician.  *Id.*

On January 8, 2007, Licea went to Dr. Scott Gudeman, M.D. ("Dr. Gudeman") for an initial evaluation and treatment of her left shoulder because of pain.  *Id.* at 349.  Licea reported that she had been treated for bilateral epicondylitis for the past several months and had been seen by Drs. Whitaker and Steinberg.  *Id.*  Dr. Gudeman noted that "[s]he admits that her left shoulder complaints are very mild, especially when compared to her bilateral epicondylitis."  *Id.*  X-rays of Licea's left shoulder revealed "normal alignment, and normal bony ossification.  There is no dislocation, fracture, or subluxation. . . [but] reveal Type 1 acromion."  *Id.* at 349-50.  Dr. Guderman also noted

that an MRI of the left shoulder performed on or around October 9, 2006, gave the following impressions:  "AC joint degenerative change" and "[f]indings consistent with tendinosis/tendinopathy involving supraspinatus tendon without evidence of full thickness supraspinatus tendon tear."  *Id.* at 350.  Dr. Guderman gave the following assessment:  "Syndrome H Impingement, Shoulder, 726.2."  *Id.*  Dr. Guderman offered Licea injections or surgery, both of which she declined.  *Id.*  He referred Licea to Dr. Buschbacher for assessment of shoulder restrictions and opined that her left shoulder impingement was work-related, but the AC joint arthropathy was not.  *Id.*

Visit notes from a hospital clinic indicate that on December 1, 2009, Licea complained of back, elbow and neck pain.  *Id.* at 379.  She was referred for a rehab medicine consult.  *Id.*

Licea was evaluated by Dr. Jeffery Nace M.D. ("Dr. Nace") on December 8, 2009.  *Id.* at 406-08.  Dr. Nice diagnosed Licea with shoulder impingement and concluded that the prognosis was guarded.  *Id.* at 407.  Dr. Nace imposed the following specific restrictions with respect to performance of sustained work activity:  "No repetitive use, lifting or gripping with [Left] arm.  Five pound frequent and ten pound occasional lifting restriction with [Left] arm.  No over the shoulders use of [Left] arm."  *Id.* at 407.  Other restrictions included no crawling or climbing and only occasional stooping, balancing, kneeling or crouching.  *Id.* at 408.  Dr. Nace also recommended that Licea not perform work around moving machinery, be exposed to marked changes in temperature and humidity or be exposed to dust, fumes and gases.  *Id.*

On August 10, 2010, Licea had an MRI of the lumbar spine.  *Id.* at 439.  The radiologist reported mild degenerative changes of the lumbar spine, worst at L3-L4.  *Id.*

Specifically, Licea had a positive straight leg test on the left side; minimal diffuse disc bulge with tiny extrusion superiority at L3-L4; and mild diffuse disc bulge with mild foraminal stenosis at L4-L5.  *Id.*

### 2. Social Security Administration Consultative Exams

On November 30, 2007, Dr. Doug Poplin, MD, MPH ("Dr. Poplin") performed an exam on Licea for the Social Security Administration.  R. at 358-61.  Licea reported disability due to pain in her arms and difficulty with the following tasks:  walking across a room, walking a block, walking 2-3 blocks, walking 0.5 miles, picking up small objects, opening jars, reaching over head, doing heavy housework, doing light housework, fixing meals, grocery shopping, taking medicines, paying bills, bathing, dressing, going to the bathroom and driving.  *Id.* at 358.  She also reported pain and stiffness in her neck; and weakness, pain, stiffness, limited movement and muscle cramping in muscles and bones.  *Id.* at 359.  Dr. Poplin reported "mildly decreased ability to perform gross grasping and fine motor tasks such as buttoning, writing, and picking up small objects; no deformities, tender over left anterior shoulder, bilateral lateral epicondyles, radial tunnels, and left medial epicondyle; positive tinel's over both radial tunnels, positive left impingement sign."  *Id.* at 360.  Dr. Poplin also reported that Licea's grips were decreased to three out of five.  *Id.*  Dr. Poplin's impressions included:  bilateral radial tunnel syndrome, bilateral lateral epicondylitis with medial epicondylitis, and left shoulder impingement syndrome.  *Id.* at 361.

Dr. Poplin evaluated Licea for the Social Security Administration again on March 4, 2009.  *Id.* at 381-84.  At this time, Licea reported difficulty with the following daily activities: walking a block, walking 2-3 blocks, walking 0.5 miles, picking up small

objects, opening jars, reaching over head, doing heavy housework, doing light housework, fixing meals, grocery shopping, bathing, dressing, going to the bathroom, driving and getting out of bed or a chair.  *Id.* at 381.  Licea also reported headache; pain and tearing of the eyes; ringing in the ears; pain in the neck; vomiting blood, nocturnal urination; cold feet; weakness, pain stiffness, limited movement and muscle cramping in the muscles and bones.  *Id.* at 382.

> Upon examination, Dr. Poplin found
>
> normal ability to perform gross grasping and fine motor tasks such as buttoning, writing, and picking up small objects; no deformities, mild diffuse tenderness to palpation; more intense tenderness was noted in bilateral later epicondyles, medial epicondyles, and radial tunnels (L>>R), the left anterior shoulder, and the left great trochanger; tinel's over the radial tunnels was negative on the right and equivocal on the left, negative tinel's over the ulnar and median nerves, positive left shoulder impingement sign.

*Id.* at 383.  He also found Licea's grips decreased at four out of five.  *Id.* at 384.  Dr. Poplin's impressions included:  fibromyalgia, bilateral lateral and medial epicondylitis, mild bilateral radial tunnel syndrome, left should impingement syndrome and left trochanteric bursitis.  *Id.* at 384.

## E.  RELEVANT ASCPECTS OF THE ALJ'S DECISION

The ALJ stated that since the alleged date of Licea's disability, February 24, 2006, she "has had the following severe impairments:  impingement, left shoulder; lateral and medial epicondylitis, bilateral; trochanteric bursitis, left side; radial tunnel syndrome, bilateral, mild, and fibromyalgia (20 C.F.R. §§ 404.1520(c) and 416.920(c))." R. at 18.  The ALJ then considered the medical evidence and determined "that these impairments, individually, and in combination, [did] not meet any listing [of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d),

414.1525, 404.1526, 416.920(d), 416.925 and 416.926], in particular, 1.02 *Major dysfunction of a joint(s) (due to any reason)*." *Id.* The ALJ cited the following criteria for finding an impairment(s) affecting an individual's joints disabling:

> [E]vidence of gross anatomical deformity of the affected joint(s), chronic joint pain, joint stiffness with signs of limitation of motion or other abnormal motion, and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). Additionally, there must be evidence of (A) involvement of one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively; or (B) involvement of one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively.

*Id.* at 19.

The ALJ considered the record medical evidence, including the first consultative examination, regarding Licea's left shoulder and concluded that the impairment was not disabling because it did not meet the listing criteria. *Id.* The ALJ also considered additional diagnoses in the record including epicondylitis, radial tunnel syndrome, trochanteric bursitis; he noted that these impairments are not recognized in a listing, but considered them in combination. *Id.* at 19-20. The ALJ evaluated the evidence of Licea's elbow pain and treatment, as well as the evidence from her consultative examinations and concluded that these impairments in combination did not meet any listing. *Id.*

The ALJ then considered Licea's diagnosis of fibromyalgia in March 2009, but noted that Licea had never met with a rheumatologist or received fibromyalgia-specific treatment and concluded that this impairment was not disabling. *Id.* at 20.

Next, the ALJ determined Licea's residual functional capacity ("RFC") by considering all symptoms and the extent to which those symptoms could reasonably be

accepted as consistent with the objective medical evidence or other evidence, including opinions. *Id.* (citing 20 C.F.R. §§ 404.1529, 416.929, 404.1527, and 416.927; Social Security Regulations 96-4p, 96-7p, 96-2p, 96-5p, 96-6p and 96-3p ("SSRs")). *Id.* The ALJ recited Licea's testimony about her disability and symptoms as well as her subjective complaints of pain level. *Id.* at 21. He also recited Licea's reports of limitations on her ability to perform certain tasks as further supported by Licea's daughter's testimony. *Id.* The ALJ then concluded:

> After careful consideration of the evidence, the undersigned finds it reasonable to expect that the claimant's medically determinable impairments could cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment.

*Id.* However, the ALJ went on to state that the objective medical evidence did not support Licea's claims of disabling pain. *Id.* Primarily, the ALJ considered the results of Licea's two consultative examinations performed approximately sixteen months apart and focused on her fine motor abilities. *Id.*

The ALJ concluded that Licea could perform work that required a sedentary level of exertion with additional restrictions that were more limiting than those suggested by the consultative examiner, but less limiting than those suggested by Licea's primary care provider because of the evidence presented at the hearing. *Id.* at 21-22.

The ALJ also noted that on her birthday in 2010, Licea's age category changed from a younger individual aged 18-44, to a younger individual age 45-49. *Id.* at 22 (citing 20 C.F.R. §§ 404.1563 and 416.963). He further noted that Licea cannot communicate in English, therefore, she is considered the same way as an individual who is illiterate in English. *Id.* (citing 20 C.F.R. §§ 404.1564 and 416.964). As a result,

the ALJ concluded that prior to Licea's birthday in 2010, "considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. §§ 404.1569, 404.1569a, 416.969 and 416.969a)." *Id.* Applying the relevant Medical Vocational Guides and Medical-Vocational Rule 201.23, the ALJ concluded that prior to her birthdate in 2010, Licea was not disabled. *Id.* at 23 (also citing SSRs 83-10, 83-12, 82-35c and 82-36c). However, applying Medical-Vocational Rule 201.23, the ALJ concluded that Licea became disabled as of her birthday in 2010 and continued to be disabled through the date of the ALJ's decision. *Id.*

## II. STANDARD

To be eligible for DIB and/or SSI, a claimant must have a disability under 42 U.S.C. § 423. "Disability" means the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423 (d)(1)(A). In determining whether a claimant is disabled, the ALJ applies a five-step process set forth in 20 C.F.R. § 404.1520(a)(4):

I.     If the claimant is employed in substantial gainful activity, the claimant is not disabled.

II.    If the claimant does not have a severe medically determinable physical or mental impairment or combination of impairments that meets the duration requirement, the claimant is not disabled.

III.   If the claimant has an impairment that meets or is equal to an impairment listed in the appendix to this section and satisfies the duration requirement, the claimant is disabled.

IV.    If the claimant can still perform the claimant's past relevant work given the claimant's residual functional capacity, the claimant is not disabled.

V.     If the claimant can perform other work given the claimant's residual functional capacity, age, education, and experience, the claimant is not disabled.

The burden of proof is on the claimant for the first four steps, but then it shifts to the Commissioner at the fifth step. *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).

The Social Security Act, specifically 42 U.S.C. § 405(g), provides for judicial review of the Commissioner's denial of benefits. When the Appeals Council denies review of the ALJ's findings, the ALJ's findings become findings of the Commissioner. *See Craft v. Astrue*, 539 F.3d 668, 673; *Hendersen v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999). This Court will sustain the ALJ's findings if they are supported by substantial evidence. 42 U.S.C. § 405(g); *Craft*, 539 F.3d at 673; *Nelson v. Apfel*, 131 F.3d 1228, 1234 (7th Cir. 1999). "Substantial evidence is 'such evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Craft*, 539 F.3d at 673 (quoting *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). In reviewing the ALJ's findings, the Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the ALJ. *Nelson*, 131 F.3d at 1234.

The ALJ "need not evaluate in writing every piece of testimony and evidence submitted." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). However, the "ALJ's decision must be based upon consideration of all the relevant evidence." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). *See also*, *Craft*, 539 F.3d at 673. Further, "[a]n ALJ may not discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning." *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).

14

*See also*, *Craft*, 539 F.3d at 673 (stating that not all evidence needs to be mentioned, but the ALJ "must provide an 'accurate and logical bridge' between the evidence and the conclusion" (quoting *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004)).   An ALJ's articulation of his analysis enables the Court to "assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review."   *Craft*, 539 F.3d at 673.

## III. <u>ANALYSIS</u>

Licea asserts that the Commissioner's decision must be reversed because the ALJ failed to support his conclusions with respect to the onset date of Licea's disability with objective medical evidence, ignores relevant medical evidence to the contrary and failed to consider whether her impairments were medically equal to a listing.  Dkt. Nos. 19, at 8-14; 27, at 3-4 & 6-12.  Further, Licea argues that the ALJ erred when he made his onset date conclusion using the Grid instead of with the aid of a physician as required by SSR 83-20.  Dkt. Nos. 19, at 8-14; 27, at 4-6.   Licea also questions the ALJ's credibility determination arguing that it is unsupported by objective medical evidence and is nonsensical.  Dkt. Nos. 19, at 15-18; 27, at 14.

The Commissioner asserts that the ALJ's decision is properly supported by substantial evidence and Licea has not shown otherwise.   Dkt. No. 25, at 5-9.  Specifically, the Commissioner argues that the ALJ's RFC determination is supported by objective medical evidence.  *Id.* at 5-6 (citing R. at 390-97; 401; 407-08).  Further, the Commissioner states that the ALJ did not err in determining the onset date of Licea's disability because he properly determined her RFC and then noted the legal ramifications of her change in status under the Grid on her birthday in 2010.   *Id.* at 6-7

15

(citing *Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997)).   In addition, the Commissioner avers that the ALJ did not need to consult with a physician to determine proper application of the Grid after properly determining her RFC.  *Id.* at 7.  Finally, the Commissioner contends that the ALJ's credibility determination was supported by objective evidence and is not patently wrong; therefore, the Court should not overturn it. *Id.* at 7-9.

The Court concludes that the ALJ properly followed the guidelines when determining Licea's RFC and that she was not disabled; then applied the Grid to conclude that she became disabled on her birthday in 2010.  The ALJ's opinion carefully traced the five-step protocol as required by the Social Security regulations.  Specifically, at Step 1, the ALJ concluded that Licea had not engaged in substantially gainful activity since the alleged onset date of April 24, 2006.  R. at 18.  Next, at Step 2, the ALJ determined that Licea had sever severe impairments:   impingement, left shoulder; lateral and medial epicondylitis, bilateral; tronchanteric bursitis, left side; radial tunnel syndrome, bilateral, mild; and fibromyalgia.  *Id.*

Then, at Step 3, the ALJ considered all of Licea's severe impairments, individually and in combination, and determined that they neither met or equaled a Listing.  *Id.* at 18-20.  Licea argues that the ALJ only considered evidence tending to support his conclusions and therefore, it is unsupported by substantial evidence.  But the opinion references numerous negative findings including the degenerative changes in Licea's left shoulder as shown by an MRI, the limitations in her ability to use her arms as observed by the Social Security consultative examiner, Licea's continuous complaints of pain in her elbows and the unsuccessful treatment of those symptoms.

16

*Id.* at 19.   The ALJ is not required to recite every piece of testimony or evidence submitted, he must only "articulate, at some minimum level, his analysis of the evidence to allow the [Court] to trace the path of his reasoning."   *Diaz*, 55 F.3d at 307.   In Licea's case, the ALJ competently and systematically listed the objective and subjective evidence of Licea's impairments presented to him to conclude that those impairments did not, individually or in combination, meet or equal a listing.   Moreover, the depth of the analysis shows that substantial evidence supports his conclusion.

In the next part of his analysis, a combination of Steps 4 and 5 of the evaluative process, the ALJ addresses Licea's RFC.  R. at 20-22.  First, Licea takes issue with the ALJ's credibility determination; however, the Court concludes that his opinion is supported by the objective medical evidence and is not patently wrong.  *See Shidler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) ("Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is patently wrong. . . .   On review, we merely examine whether the ALJ's determination was reasoned and supported." (quotations and citations omitted)); *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008) (stating that "[i]t is only when the ALJ's determination lacks any explanation or support that we will declare it to be patently wrong" (quotations and citations omitted)).   Although the ALJ seemed to base his decision of Licea's credibility on his opinion of her RFC, *see* R. at 21 ("the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment"), the ALJ made this statement in the context of his evaluation of the medical evidence of record because he goes on to examine the

medical evidence of record regarding Licea's pain. *Id.* at 21-22. The Court is of the opinion that the ALJ merely misspoke when he referenced the RFC finding and meant to refer to the objective medical evidence. Such a conclusion is supported by the next two paragraphs where the ALJ specifically contrasts Licea's testimony about her pain with the objective medical evidence in the record. *Id.* at 21 (paragraphs five and six). Therefore, because the ALJ's determination of Licea's credibility has both explanation and support, the Court concludes that it is not patently wrong.

Licea never really challenges the ALJ's determination of her RFC other than to say he failed to consider evidence that several physicians reported that Licea was not able to work dating back to 2006. However, the ALJ reviewed and cited to reports from her physicians dating that far back and none of those physicians ever opined that Licea could not perform some work; only that she was not performing her past work and that her employer could not accommodate her restrictions. R. at 245-46 (Dr. Buschbacher's report that she should continue with work restrictions); 240 (Dr. Buschbacher's assessment that she could do office or sedentary work, but no housekeeping); 302 (Dr. Steinberg's notes reflect that Licea was not working because her employer could not accommodate her restrictions). In fact, Licea fails to recite the entirety of at least one of the records upon which she relies because her statements do not include comments related to Licea's ability to perform light, sedentary work, but not her past work. *Compare* Dkt. No. 27, at 7-8 (citing Dr. Buschbacher's statement she could not do any kind of housekeeping activities at that time) *with* R. at 240 (stating that Licea could perform office or sedentary work, but being unsure of her qualifications for same); *compare also* Dkt. No. 27, at 8 (stating that Dr. Steinberg reported that Licea was not

able to work) *with* R. at 302 (stating that Licea reported that she was not working, but it was because her employer could not accommodate her restrictions). Further, the ALJ's RFC was more restrictive that the Social Security Administration's medical examiner's recommendation, but less than that of her own physician. R. at 22. The ALJ came to this conclusion because the ALJ found the testimony at the hearing partially credible, but concluded that her physician's recommendation was not supported by the objective medical record, which the ALJ had previously considered in the opinion. R. at 18-22. There was no error made in determining Licea's RFC because it is supported by substantial evidence and the Court was able to trace the ALJ's reasoning.

Finally, Licea argues that the ALJ erred after he determined Licea's RFC when he applied to Grid to determine that Licea had become disabled on her birthday in 2010. But Licea fails to understand the ALJ's decision as a whole. The ALJ concluded that from the date of Licea's alleged onset date of February 24, 2006, until her birthday in 2010, she was not disabled based the evidence and her RFC because "there were jobs that existed in significant numbers in the national economy that she could have performed." *Id.* at 22-23. In other words, Licea was not disabled on her alleged onset date and, absent the change in her age in 2010, she would not be entitled to any disability benefits. The ALJ specifically addressed his findings that supported this conclusion. *Id.* at 23. But, because her status changed on the date of her birthday in 2010, beginning on that date, and applying the factors in 20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c) and 416.966, the ALJ concluded that "considering the claimant's age, education, work experience, and residual functional capacity, there are no jobs that exist in significant numbers in the national economy that the claimant could perform."

19

Therefore, as of her birthday in 2010 she was disabled upon application of the Grid, or Medical-Vocational Rule 201.17.  *Id.*

Contrary to Licea's argument, the ALJ did not improperly determine the onset of her disability; rather, he established that absent any legally significant change in the evaluation criteria, Licea was not disabled.  R. at 22.  However, because of the legal significance of the change in her age, not because of a change in her physical condition, under the regulations, Licea became disabled on her birthday in 2010.  *See* C.F.R. pt. 404, subpt. P, app. 2 §§ 200.00, 201.17 and 201.23.  SSR 83-20 simply does not apply to the facts here, where the ALJ concluded that the evidenced showed Licea's ability to perform a significant number of jobs in the national economy requiring light work (and her additional restrictions) under the Grid, but upon Licea's birthday in 2010, according to those guidelines, she was disabled under Rule 202.06.  *Accord Perkins v. Chater*, 107 F.3d 1290, 1295-96 (explaining that a conclusion that a claimant's disabilities were relatively constant, but that the claimant's age reached the level specified in the Grid to qualify him for benefits did not require further evidence pursuant to SSR 83-90).

## IV.  <u>CONCLUSION</u>

For the reasons stated herein, the Court **AFFIRMS** the decision of the Commissioner of Social Security.

IT IS SO ORDERED this 15th day of January, 2014.

LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution attached.

Distribution:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov